# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
### CENTRAL DIVISION

JOHN Z. GOMEZ, JR.,

       Plaintiff,

v.

MICHAEL J. ASTRUE,
Commissioner of Social
Security,

       Defendant.

No. 11-CV-3011-DEO

**Memorandum and Opinion Order**

_____

## I. INTRODUCTION AND BACKGROUND

This matter is before the Court pursuant to John Z. Gomez, Jr.'s (Plaintiff) request for disability benefits under Title II of the Social Security Act (the "Act"), 42 U.S.C. §§ 401 et seq., as well as supplemental security income benefits under Title XVI of the Act, 42 U.S.C. §§ 1381 et seq. Docket No. 3.

On April 21, 2009, Plaintiff, alleging a disability onset date of June 10, 2008, filed for disability and supplemental security income benefits. Tr. 11. Plaintiff is insured under the Act through December 31, 2013. Id. Plaintiff's claims were initially denied on July 23, 2009, and upon reconsideration on October 17, 2009. Id. After an

Administrative Law Hearing on February 24, 2010, an Administrative Law Judge (ALJ) determined Plaintiff was not disabled in a decision dated March 5, 2010. Tr. 11-22. On February 15, 2011, the Disability Appeals Council denied Plaintiff's request for review; and on June 27, 2011, Plaintiff timely filed for review with this Court. Tr. 1-5 and Docket No. 1. This Court has jurisdiction pursuant to 42 U.S.C. § 405(g) and 42 U.S.C. § 1383(c)(3).

Prior to the Appeals Council's decision, Plaintiff was found disabled as of November 15, 2010. Thus, though Plaintiff is currently on disability, the question remains as to whether Plaintiff should have been deemed disabled between June 10, 2008, and March 5, 2010, the time period between Plaintiff's claimed onset date and the ALJ's decision to deny Plaintiff's claim.

## II.  FACTS

At the time of the ALJ hearing on February 24, 2010, Plaintiff was a 60 year old homeless man living in a shelter. Tr. 36. Plaintiff is 5' 8" and weighs approximately 290 pounds. He went to school through the 8th grade and later received a GED and some credits at a community college in auto

repair.  Tr. 296.  Over the years, Plaintiff performed a number of jobs from truck mechanic to security guard.  Tr 155. He stopped working in 2008.  <u>Id.</u>

In an adult disability report, dated October 17, 2008, Plaintiff indicated he suffered from dizziness and headaches, resulting in fits of vomiting and loss of balance.  Tr. 154. In an adult function report, dated October 17, 2008, Plaintiff indicated he had difficulty sleeping, dressing, bathing, feeding himself, and shaving.  Tr. 163.  He also indicated he had trouble lifting, squatting, bending, standing, walking, sitting, kneeling, stair climbing, seeing, completing tasks, concentrating, and using his hands.  Tr. 167.  He thought he could walk up to 2 blocks before requiring a 10 minute rest before resuming.  Tr. 167.  He reported a limited attention span, difficulty completing tasks, and problems following written instructions.  Tr. 167.

In an adult third party function report, dated October 27, 2008, Plaintiff's friend, Balinda Crete, corroborated Plaintiff's complaints of difficulty walking because of his dizzy spells.  Tr. 195.

In a migraine headache questionnaire, dated April 29, 2009, Plaintiff indicated his headaches could be brought on by nearly any activity, including bending over or just going outside. Tr. 211. His headaches caused dizziness, blurred vision, nausea and vomiting, as well as sensitivity to sound. Tr. 211. The headaches occurred up to 3 times per day, and the most powerful ones could last up to 3 days. Tr. 211. The headaches were often completely debilitating. Tr. 211. Plaintiff took aspirin, which offered little relief, and he had not sought other treatment due to a lack of funds. Tr. 212.

On November 11, 2008, Dr. Arnold completed an evaluation of Plaintiff's physical condition. Tr. 274-78. Plaintiff reported occasional headaches, dizziness, and loss of balance, with episodes lasting for only 5 to 6 minutes. Tr. 276. Other symptoms Dr. Arnold noted were eyesight problems, leg pain, anxiety, and depression. Tr. 276. Dr. Arnold completed a battery of physical tests, all with results within a normal range. Tr. 277. Dr. Arnold indicated Plaintiff could lift 40 pounds, could stand for 20 minutes, could sit for 30 minutes, and could walk up to 2 blocks. Tr. 276.

In a physical residual functional capacity assessment, dated November 25, 2008, a non-examining, consulting physician, Dr. John May, determined Plaintiff had no established exertional limitations, other than an inability to climb ladders, ropes, and scaffolds, no postural limitations, no established manipulative limitations, no established visual limitations, no established communicative limitations, and no environmental limitations other than a need to avoid concentrated exposure to hazards, such as machinery and heights. Tr. 280-83. At the time Dr. May filled out his report, the only medical evidence on record relating to Plaintiff's physical capacities was that of Dr. Arnold. Tr. 285.

On May 5, 2009, Plaintiff saw Dr. Marilim for intermittent headaches and blurred vision. Dr. Marilim noted that Plaintiff lacked insurance, as well as other means of paying for medical care. Dr. Marilim gave Plaintiff a Hyzaar sample for his hypertension, and suggested Ibuprofen and Aleve for his headaches.

On May 20, 2009, Dan Fullerton, a Licensed Master Social Worker (LMSW), saw Plaintiff for depression. Plaintiff

reported a lack of energy and ambition, a complete loss of sex drive, and poor short and long term memory. Tr. 296. LMSW Fullerton assigned Plaintiff a GAF[1] of 45[2] and concluded:

> [h]e has been turned down for SSI [supplemental security income] once[,] and I don't understand that; he has enough physical problems that they should have put him on that and he should qualify for SSD [social security disability] if he worked for 28 years.

Tr. 297.

On June 8, 2009, Plaintiff went to Dr. Abernathy at the University of Iowa, complaining of headaches. Tr. 303. Plaintiff reported that he was taking 20 aspirin a day, which, though it decreased the intensity of his headaches, did not make them go away. Id. His headaches caused blurred vision

---

[1] "The GAF Scale may be particularly useful in tracking the clinical progress of individuals in global terms, using a single measure . . . The GAF scale is divided into 10 ranges of functioning. Making a GAF rating involves picking a single value that best reflects the individual's overall level of functioning." American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders*, 32 (4th ed., Text Revision 2000).

[2] A score of 41 to 50 indicates "serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning . . . ." American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders*, 34 (4th ed., Text Revision 2000).

6

in his right eye, occasional dizziness, and nausea.  Sometimes the headaches lasted for several days.  Id.

On June 15, 2009, Dr. Smith completed a consultative psychological examination of Plaintiff at the request of DDS. Tr. 307-10.  Dr. Smith noted that Plaintiff's mood and affect were mildly depressed, but he was not irritable or anxious. Tr. 309.  She assigned Plaintiff a GAF score of 58[3] and concluded that he had:

> the cognitive capacity to attend to, understand, remember, and follow directions/procedures at a level suggested by his educational and vocational history . . .  In general, I believe that his ability to appropriately interact with co-workers and supervisors is not significantly limited.  However, secondary effects of his current suspected mild mood disorder and alleged medical problems could affect the consistency with which he can sustain attention (and subsequently remember and follow instructions/procedures), interact appropriately with others, use sound judgment, maintain pace, and adjust appropriately to changes in typical work environments . . .  His simple judgment appears to be grossly intact, but insight is limited.

---

[3] A GAF score of 51-60 indicates moderate difficulty in social, occupational, or school functioning.  American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders*, 34 (4th ed., Text Revision 2000).

Tr. 310.

In a psychological report, dated July 15, 2009, Dr. Keraus conducted an assessment based on the Beck Depression Inventory,[4] Rorschach Method of Personality Diagnosis,[5] a Clinical Interview, and a review of Plaintiff's records. Dr. Keraus noted that Plaintiff described physiological signs of anxiety attacks, including: racing heart, subjective worry, muscular tension, headaches, and rapid breathing. Tr. 336. Plaintiff also indicated having passive thoughts of death and pessimism, though he denied active, suicidal ideation. Tr. 336. Dr. Keraus determined Plaintiff suffered from Dysthymic

---

[4] "The Beck Depression Inventory (BDI) is a series of questions developed to measure the intensity, severity, and depth of depression in patients with psychiatric diagnoses. Its long form is composed of 21 questions, each designed to assess a symptom common among people with depression." *Beck Depression Inventory*, Encyclopedia of Mental Disorders, available at http://www.minddisorders.com/A-Br/Beck-Depression-Inventory.html, last visited September 25, 2012.

[5] A Rorschach test is a "psychological test in which a subject's interpretations of a series of standard inkblots are analyzed as an indication of personality traits, preoccupations, and conflicts." *Rorschach test*, The Free Dictionary, available at http://www.thefreedictionary.com/Rorschach+test, last visited September 25, 2012.

Disorder[6] and Generalized Anxiety Disorder with feelings of hopelessness and depressed mood.

In a psychiatric review form, dated July 20, 2009, Dr. Lovell, a non-examining DDS employee, found Plaintiff suffered from depression and mood disorder but his conditions were not severe. Tr. 311. More specifically, Dr. Lovell found Plaintiff had mild restrictions of daily living and difficulties maintaining concentration, persistence, or pace but no difficulties in maintaining social functioning. Tr. 321. Dr. Lovell concluded:

> [Plaintiff's] depressive disorder appears to be nonsevere. Based on mental status testing, past work, and ADL's [activities of daily living], the claimant has the ability to understand and remember instructions and procedures for basic and detailed tasks. Concentration is sufficient to carry out tasks at those levels with no more than mild variability. The [Plaintiff's] presentation and history indicate adequate interpersonal skills. Per treatment history and ADL's the claimant would be mentally able to regularly complete a typical work week . . . .

---

[6] Dysthymic Disorder "is a chronic type of depression in which a person's moods are regularly low. However, symptoms are not as severe as with major depression." *Dysthymia*, PubMed Health, available at http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0001916/, last visited September 25, 2012.

Tr. 323.

On July 21, 2009, Dr. Stutts completed a psychological evaluation of Plaintiff. Tr. 331. Dr. Stutts indicated Plaintiff exhibited anxiety, depression, and unease and assigned him a GAF of 50. Tr. 332. On September 15, 2009, Dr. Stutts again saw Plaintiff and indicated Plaintiff was "anxious and somatically preoccupied." Tr. 337 and 377. He also indicated Plaintiff, in addition to Depression and Generalized Anxiety Disorder, may be suffering from mood or personality changes secondary to an endocrine condition. Tr. Tr. 337.

In a letter dated September 22, 2009, LMSW Fullerton wrote DDS on behalf of Plaintiff. Tr. 330. LMSW Fullerton indicated Plaintiff would have difficulty remembering and understanding instructions, procedures, and locations; difficulty carrying out instructions, maintaining attention, concentration and pace; difficulty acting appropriately with co-workers, superiors, supervisors, and the public; and difficulty using good judgment and responding appropriately to changes in the workplace. Tr. 330.

On September 24, 2009, Dr. Tashner, a non-examining DDS consultant, completed a mental residual capacity assessment. Tr. 338-40. In terms of Plaintiff's ability to understand and remember, Dr. Tashner determined Plaintiff was moderately limited in relation to detailed instructions. Tr. 338. In terms of Plaintiff's sustained concentration and persistence, Dr. Tashner determined he was moderately limited in his ability to carry out detailed instructions, maintain attention and concentration for extended periods, and work in coordination or proximity to others without being distracted by them. Tr. 338. In terms of Plaintiff's sustained concentration and persistence, Dr. Tashner determined he was moderately limited in his ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. Tr. 339. In terms of Plaintiff's social interaction, Dr. Tashner determined Plaintiff was moderately limited in his ability to interact appropriately with the general public. Tr. 339. In terms of Plaintiff's adaptation skills, Dr. Tashner determined Plaintiff was moderately limited in his ability to respond

appropriately to changes in the work setting and set realistic goals or make plans independently of others. Tr. 339. Dr. Tashner discounted the functional limitations LMSW Fullerton assigned Plaintiff on the basis that LMSW Fullerton is a social worker and, as such, not an "acceptable source" within the regulations. Dr. Tashner concluded: "[o]verall, exams and ADLS do show mental limitations, however, he would be capable of performing unskilled work activity at this time." Tr. 340.

On November 10, 2009, Dr. Upadhyay conducted a psychological examination of Plaintiff. Plaintiff reported feeling hopeless and helpless. Plaintiff could not remember the last time he was happy. Tr. 374. He also reported poor energy levels, motivation, focus and concentration, as well as anxiety, frustration, and a general desire to die, though he denied any active suicidal/homicidal ideation. Tr. 374. Dr. Upadhyay noted that Plaintiff's records showed great inconsistency related to when he last used alcohol, and that Plaintiff smelled like alcohol upon coming into the office. Tr. 374. Dr. Upadhyay assigned Plaintiff a GAF of 50, and warned Plaintiff about the dangers of mixing alcohol and his

antidepressant medication and told him to call the ER if he developed problems with suicidal ideation.  Tr. 376.

At the ALJ hearing on February 24, 2010, Plaintiff testified he suffered from "real bad headaches" and dizziness. Tr. 34.  His headaches occurred daily and were sometimes severe enough to lay him up for 2 to 3 days at a time.  Id. He also testified that his memory was bad, and he lacked the ability to concentrate.  Though Plaintiff was not certain, he thought his symptoms were related to his hypertension, depression, or a pituitary tumor he was diagnosed with in 1987. Tr. 35 and 45.  Physically, Plaintiff reported that his arms ache, his legs swell up, he has difficulty breathing, and he could only walk for a block or two at a time due to a heart condition.  Tr. 38 and 45.

On February 5, 2010, LMSW Fullerton completed a form related to Plaintiff's ability to do work related activities. Tr. 385.  The form indicates Plaintiff is seriously limited but not precluded in relation to the following abilities:  to remember work-like procedures; to understand and remember very short and simple instructions; to maintain regular attendance and be punctual within customary, usually strict tolerances;

13

to make simple work-related decisions; to perform at a consistent pace without an unreasonable number and length of rest periods; to ask simple questions or request assistance; to get along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes; to understand and remember detailed instructions; to interact appropriately with the general public; and to adhere to basic standards of neatness and cleanliness. Tr. 385-86. The form also indicates Plaintiff is unable to meet competitive standards in relation to the following abilities: to use public transportation, to travel in [an] unfamiliar place, to maintain socially appropriate behavior, to deal with stress of semiskilled and skilled work, to set realistic goals or make plans independently of others, to carry out detailed instructions, to be aware of normal hazards and take appropriate precautions, to deal with normal work stress, to respond appropriately to changes in a routine work setting, to accept instructions and respond appropriately to criticism from supervisors, to complete a normal workday and workweek without interruptions from psychologically based symptoms, to work in coordination with or proximity to others without being

unduly distracted, to sustain an ordinary routine without special supervision, and to maintain attention for two hour segments. Tr. 385. LMSW Fullerton then noted Plaintiff would be absent for more than four days per month and attributed his limitations to "profound depression." Tr. 386.

## III.  THE ALJ'S DECISION

Under the authority of the Act, the Social Security Administration (SSA) has established a five-step sequential evaluation process for determining whether an individual is disabled and entitled to benefits. 20 C.F.R. §§ 404.1520 and 416.920. The five successive steps are: (1) determination of whether claimant is engaged in "substantial gainful activity," (2) determination of whether claimant has a "severe medically determinable physical or medical impairment" that lasts for at least 12 months, (3) determination of whether claimant's impairment or combination of impairments meets or medically equals the criteria of a listed impairment, (4) determination of whether claimant's Residual Functional Capacity (RFC) indicates an incapacity to perform the requirements of his/her past relevant work, and (5) determination of whether, given claimant's RFC, "age education and work experience," claimant

15

can "make an adjustment to other work." 20 C.F.R. § 404.1520(4)(i-v) and 416.920(a)(4)(i-v).

At step one, if Plaintiff is engaged in "substantial gainful activity" within the period Plaintiff claims to be disabled, there is no disability during that period. 20 C.F.R. §§ 404.1520(a)(4)(i) and 416.920(a)(4)(i). The ALJ determined Plaintiff was not engaged in substantial gainful activity during the relevant period for establishing disability. Tr. 13.

At step 2, if Plaintiff does not have a "severe medically determinable physical or mental impairment" that lasts at least 12 months, there is no disability. 20 C.F.R. §404.1520(a)(4)(ii) and 416.920(a)(4)(ii). The ALJ determined Plaintiff had the following severe impairments: depression, generalized anxiety disorder (GAD), headaches, hypertension, obesity, and a history of alcohol abuse. Id.

At step 3, if the Plaintiff's impairments meet or medically equal the criteria of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, and last at least 12 months, the Plaintiff is deemed disabled. 20 C.F.R. §§ 404.1520(e) and 416.920(a)(4)(iii). The ALJ determined

Plaintiff did not have an impairment or combination of impairments that meets or medically equals a listed impairment. Tr. 14.

Before proceeding to step 4 and 5, the ALJ must determine the Plaintiff's Residual Functional Capacity (RFC). RFC is the "most" a person "can still do" despite their limitations. 20 C.F.R. § 404.1545(a)(1). The ALJ found Plaintiff had the following RFC:

> [Plaintiff] has the residual functional capacity [to] perform work at the medium exertional level except that the claimant can make only simple work-related judgments and decisions. He can understand, remember, and carry out only short, simple instructions. He can deal with only occasional changes in a routine work setting. He can have only occasional contact with the public, co-workers, or supervisors.

Tr. 15.

At step 4, if, given Plaintiff's RFC, Plaintiff can still perform his past relevant work, there is no disability. 20 C.F.R. §§ 404.1520(a)(4)(iv) and 416.920(a)(4)(iv). The ALJ determined Plaintiff was unable to perform any past relevant work. Tr. 20.

At step 5, if, given Plaintiff's RFC, age, education, and work experience, Plaintiff can make an adjustment to other work, there is no disability. 20 C.F.R. §§ 404.1520(a)(4)(v) and 416.920(a)(4)(v). This step requires the ALJ to provide "evidence" that Plaintiff could perform "other work [that] exists in significant numbers in the national economy." 20 C.F.R. § 404.1560(c)(2). In other words, at step 5, the burden of proof shifts from Plaintiff to the Commissioner. Basinger v. Heckler, 725 F.2d 1166, 1168 (8th Cir. 1984). At the administrative level, an ALJ generally calls a Vocational Expert (VE) to aid in determining whether this burden can be met. In this case, the ALJ, based on the testimony of a VE, determined there were jobs that exist in significant numbers in the national economy that Plaintiff could perform, including laundry worker and kitchen helper. Tr. 20-21.

**IV. LAW AND ANALYSIS**

In order for a Petitioner to qualify for disability benefits, they must demonstrate they have a disability as defined in the Social Security Act (the "Act"). The Act defines a disability as an:

> inability to engage in any substantial
> gainful activity by reason of any medically

determinable physical or mental impairment
which can be expected to result in death or
which has lasted or can be expected to last
for a continuous period of not less than 12
months . . . .

42 U.S.C. § 423(d)(1)(A).

**A.  Standard of Review**

This Court's role in review of the ALJ's decision
requires a determination of whether the decision of the ALJ is
supported by substantial evidence on the record as a whole.
See 42 U.S.C. § 405(g); Finch v. Astrue, 547 F.3d 933, 935
(8th Cir. 2008).  Substantial evidence is less than a
preponderance but enough that a reasonable mind might find it
adequate to support the conclusion in question.  Juszczyk v.
Astrue, 542 F.3d 626, 631 (8th Cir. 2008) (citing Kirby v.
Astrue, 500 F.3d 705, 707 (8th Cir. 2007)).  This Court must
consider both evidence that supports and detracts from the
ALJ's decision.  Karlix v. Barnhart, 457 F.3d 742, 746 (8th
Cir. 2006) (citing Johnson v. Chater, 87 F.3d 1015, 1017 (8th
Cir. 1996)).  In applying this standard, this Court will not
reverse the ALJ, even if it would have reached a contrary
decision, as long as substantial evidence supports the ALJ's
decision.  Eichelberger v. Barnhart, 390 F.3d 584, 589 (8th

Cir. 2004).  The ALJ's decision shall be reversed only if it is outside the reasonable "zone of choice."  <u>Hacker v. Barnhart</u>, 459 F.3d 934, 936 (8th Cir. 2006) (citing <u>Culbertson v. Shalala</u>, 30 F.3d 934, 939 (8th Cir. 1994)).

This Court may also ascertain whether the ALJ's decision is based in legal error.  <u>Lauer v. Apfel</u>, 245 F.3d 700, 702 (8th Cir. 2001).  If the ALJ applies an improper legal standard, it is within this Court's discretion to reverse his decision.  <u>Neal v. Barnhart</u>, 405 F.3d 685, 688 (8th Cir. 2005); 42 U.S.C. 405(g).

**B.   Plaintiff's Arguments**

Plaintiff argues the ALJ erred in two respects:  (1) the ALJ gave great weight to the opinions of state agency medical consultants but failed to incorporate the limitations those consultants identified in the hypothetical questions posed to the VE; and (2) the ALJ failed to properly consider and/or weigh some of the medical evidence.

**C.   Whether the ALJ Failed to Incorporate Limitations Assigned by State Agency Medical Consultants**

An ALJ's RFC assessment, prior to steps 4 and 5 of the sequential evaluation process, is crucial for determining

whether a plaintiff is disabled.  It has been referred to as the "most important issue in a disability case . . . ." Malloy v. Astrue, 604 F. Supp. 2d 1247, 1250 (S.D. Iowa 2009) (citing McCoy v. Schweiker, 683 F.2d 1138, 1147 (8th Cir. 1982)(en banc)).  A plaintiff's RFC is a function-by-function assessment of the most a plaintiff can still do despite his or her impairments.  S.S.R. 96-8P, 1.  When determining RFC, the ALJ must consider all of a plaintiff's impairments, even those which are not deemed severe, as well as limitations which result from symptoms, such as pain.  § 404.1545(a)(2) and (3). An RFC is "not the ability merely to lift weights occasionally in a doctor's office . . . it is the ability to perform the requisite physical acts" necessary for employment "in the real world."  Malloy v. Astrue, 604 F. Supp. 2d at 1250 (quoting 683 F.2d at 1147).

Plaintiff contends that though the ALJ gave great weight to the opinions of the state agency medical consultants, he failed to incorporate some of their findings into Plaintiff's RFC.  Specifically, Plaintiff contends the ALJ "discounted that portion of Dr. Smith's opinion relating to variability in judgment, pace, adjustment to change, maintaining attention,

and acting appropriately with others." Docket No. 15, 12. Plaintiff also contends the ALJ failed to incorporate into Plaintiff's RFC a number of moderate limitations assigned by Dr. Tachner. Docket No. 15, 14.

Dr. Smith did indicate there was a potential for variability in Plaintiff's functioning in relation to certain mental capacities, but she failed to indicate whether Plaintiff's functioning would fluctuate in a significant manner and ultimately determined Plaintiff had only a mild mood disorder. Furthermore, the RFC the ALJ assigned Plaintiff specifically indicated Plaintiff could only make "simple work related judgments and decisions," could only "understand, remember, and carry out . . . short, simple instructions," could only deal with "occasional changes in a routine work setting," and could "have only occasional contact with the public, co-workers, or supervisors." Thus, with the exception of pace, it appears the ALJ assigned greater limitations than those suggested by Dr. Smith. Therefore, it is difficult to comprehend how the RFC assigned by the ALJ failed to incorporate Dr. Smith's findings.

As to Dr. Tachner, Plaintiff contends Plaintiff's RFC should have included Dr. Tachner's findings of moderate limitations in Plaintiff's ability to maintain attention and concentration for extended periods, ability to complete a normal workday and workweek without interruption, and ability to set realistic goals or make plans independently of others. By definition, something is moderate if it is "within reasonable limits . . . ." *moderate*, The Free Online Dictionary, available at [http://www.thefreedictionary](http://www.thefreedictionary).com/moderate, last visited September 25, 2012. In Lacroix v. Barnhart, the Eighth Circuit explicitly upheld a definition of moderate that indicated a plaintiff could function satisfactorily in relation to the mental functional capacity there under consideration. 465 F.3d 881, 888 (8th Cir. 2006). An RFC need not identify what a plaintiff can do satisfactorily, and so the ALJ's failure to include moderate limitations in Plaintiff's RFC did not constitute error.

**D.   Whether the ALJ Failed to Properly Consider Other Medical Evidence**

The regulations define medical opinions as "statements from physicians and psychologists or other acceptable medical

23

sources that reflect judgments about the nature and severity of . . . impairment(s)." 20 C.F.R. § 404.1527(a)(2). If the medical evidence on record is inconsistent, an ALJ has a duty to weigh the evidence. § 404.1527(c)(2). In aid of this task, the regulations create a general hierarchy of medical evidence, distinguishing the relative weight various sources of medical evidence should be given. § 404.1527(d). At the top of the hierarchy are opinions from treating physicians; next are non-treating, examining source opinions; and, finally, there are opinions from non-examining sources, such as state agency medical consultants, whose opinions are limited to a review of a plaintiff's medical history. Id.

Of course, this hierarchy is not absolute. The opinions of treating physicians are not automatically given more weight than the opinions of examining and non-examining consultants. The regulations go on to discuss a number of factors to be considered when assessing the weight of medical opinions. § 404.1527(d)(2)-(6). For instance, treating opinions should be viewed in light of the "[l]ength of the treating relationship and frequency of examination," as well as the "[n]ature and extent of the [treating] relationship," including the type of

24

treatment provided and "the extent of examinations and testing
. . . provided." § 404.1527(d)(2).  In addition, treating,
examining, and non-examining source opinions should all be
evaluated in terms of the relevant evidence used to support
the opinion, the internal consistency of the opinion, the
specialization of the source of the opinion, and other factors
a plaintiff or others bring to the attention of the
Commissioner. § 404.1527 (d)(3)-(6).

At the hearing before this Court on January 19, 2012,
Plaintiff argued the ALJ failed to properly consider the
opinions of Dr. Arnold, Dr. Stutts, Dr. Keraus, Dr. Upadhyay,
and LMSW Fullerton, non-consulting and treating or examining
physicians whose opinions varied from those of the state
agency medical consultants.  Among the consulting physicians,
Dr. Smith and Dr. Arnold were the only ones to actually
examine Plaintiff, and, even then, on only a single occasion.
The other consulting physicians, Dr. Lovell and Dr. Tashner,
never met or examined Plaintiff; and so, their opinions were
derivative of the then available medical evidence.

LMSW Fullerton specifically indicated Plaintiff should
qualify for disability and later assigned functional

limitations indicative of disability.  The ALJ undermined LMSW Fullerton's opinion on the following bases:  (1) LMSW Fullerton is not an "acceptable medical source" as defined in the regulations; (2) LMSW Fullerton's opinion that Plaintiff is disabled is ultimately an administrative decision that is entitled to no weight; and (3) LMSW Fullerton's opinions are undermined, in part, because they were provided in a check the box form.

The regulations divide medical sources into two categories:  (1) "acceptable medical sources," and (2) "other health care providers."  20 C.F.R. §. 416.902.  Licensed physicians, licensed and certified psychologists, licensed optometrists, licensed podiatrists, and qualified speech-language pathologists are "acceptable medical sources," while licensed social workers, such as LMSW Fullerton, are given the unfortunate moniker of "other health care providers who are not acceptable medical sources."  20 C.F.R. § 416.913(d) and 20 C.F.R. § 416.902.

This Court agrees that "other medical sources" should not be used to establish "the existence of a medically determinable impairment," but the regulations elaborate

further, noting that, "[i]n addition to evidence from . . .
acceptable medical sources," an ALJ must consider "other
sources" when determining the "severity" of a plaintiff's
condition. <u>Sloan v. Astrue</u>, 499 F.3d 883, 888 (2007) (citing
20 C.F.R. § 416.927(a)(2) (2007)); 20 C.F.R. § 416.913. In
this case, Dr. Stutts, Dr. Keraus, Dr. Smith, and Dr.
Upadhyay, all established that Plaintiff suffered from some
variant of Depression and Anxiety Disorder; and LMSW
Fullerton, who provided Plaintiff ongoing counseling at the
Bridgeview Community Health Center, merely elaborated on the
severity of Plaintiff's limitations in relation thereto. Tr.
330. The reality is that many people seeking disability,
because of financial difficulties, rely on social workers and
nurse practitioners, rather than medical doctors, as their
source of primary care. As previously noted, Plaintiff was
homeless during the relevant time period and so he had limited
access to health care. "[O]ther sources" are educated,
disinterested professionals, albeit without the exhaustive
training of medical doctors, whose opinions should be
considered, rather than categorically rejected. Overall, the
state agency medical consultants' decision to ignore or fail

to comment on LMSW Fullerton's opinions, because he was not an "acceptable medical source," undermines the weight that should have been given to their opinions; and, to the extent the ALJ failed to consider LMSW Fullerton's opinion for the same reason, the ALJ's decision was contrary to the regulations and, as such, was based in error.

Though LMSW Fullerton's statements that Plaintiff should have been placed on disability constitutes an administrative finding that must ultimately be determined by an ALJ, the ALJ was wrong to give LMSW Fullerton's statement "no weight." <u>See</u> 20 C.F.R. § 404.1527(d) and SSR 96-5p. Resolute opinions of disability, though not dispositive, should, because of its unhedging clarity, be carefully considered. SSR 96-5p, 2.[7]

The ALJ was correct to note that LMSW Fullerton submitted a check the box form and only elaborated upon his findings on that form by indicating Plaintiff was "profoundly depressed." Tr. 386. However, the record also includes treatment notes, dated May 20, 2009; and a letter, dated September 22, 2009,

---

[7] Though the ALJ recognized opinions that are ultimately administrative findings must be considered, he also stated they were given no weight without providing any justification, which seems to be a contradiction.

from LMSW Fullerton to Disability Determination Services, that provide background for his findings. Furthermore, the consulting physicians, whom the ALJ gave great weight, also use check the box forms; and, therefore, the ALJ's criticism of LMSW Fullerton seems disingenuous. The bottom line is that LMSW Fullerton had a longer treating relationship with Plaintiff than anyone else on record, and, as such, he was in a better position to develop a longitudinal understanding of the affect of Plaintiff's conditions on his mental functional capacity.

In relation to Dr. Stutts, Dr. Keraus, and Dr. Upadhyay, whom either examined or actually treated Plaintiff, the ALJ's comments were limited to one, insubstantial paragraph. In relation to Dr. Upadhyay's notes, the ALJ merely noted that he indicated Plaintiff was inconsistent in relation to his statements regarding his past alcohol abuse. The ALJ failed to note that Dr. Upadhyay increased Plaintiff's Lexapro dosage, assigned him a GAF of 50[8] (indicating serious

---

[8] While GAF scores are not dispositive in disability determinations, they "can provide valuable additional functional information" and should be considered when determining a plaintiff's RFC. 65 FR 50,746, 50,745.

symptoms), and diagnosed him with Generalized Anxiety Disorder and Dysthymic Disorder, which are more severe conditions than the Mild Depression recognized by the state agency medical consultants. In relation to Dr. Keraus, the ALJ merely noted that he recommended a course of treatment of medication/psychotherapy but failed to note that Dr. Keraus conducted a Beck Depression Inventory, Rorschach Method of Personality Diagnosis, and a Clinical Interview and ultimately determined Plaintiff suffered from Generalized Anxiety Disorder and Dysthymic Disorder with "feelings of anxiety, hopelessness, and subjectively depressed mood," which, again, vary from the opinions of the state agency medical consultants. In relation to Dr. Stutts, the ALJ only considered his notes from September 15, 2009, and, even then, failed to note that Dr. Stutts indicated Plaintiff may be suffering from mood and personality changes secondary to an endocrine disorder. Dr. Stutts' notes from July 21, 2009, which the ALJ failed mention, indicate Plaintiff's GAF was then 50, which, again, indicates serious limitations that vary from the moderate to mild limitations found by the state agency medical consultants.

The opinions of state agency consultants "can be given weight only insofar as they are supported by the evidence in the case record . . . ." SSR 96-6p, 2. Because the opinions of the state agency medical consultants vary from the opinions of all of the examining and treating sources on record, with the exception of Dr. Smith (who was an examining state agency medical consultant), the ALJ's decision to give them great weight while failing to sufficiently consider or contrast them with the opinions of Dr. Keraus, Dr. Stutts, Dr. Upadhyay, and LMSW Fullerton constitutes legal error.

Dr. Arnold is a state agency consultant who saw Plaintiff in relation to his physical, as opposed to mental, condition on November 11, 2008. Significantly, Dr. Arnold's opinion is the only opinion from an examining source on record that specifically deals with Plaintiff's physical capabilities. The ALJ determined Dr. Arnold failed to provide functional limitations. Tr. 16. However, Dr. Arnold indicated Plaintiff could lift and carry 40 pounds, could stand for 20 minutes, could sit for 30 minutes, and could walk for 2 blocks. Though it is possible, as the Commissioner maintains, that Dr. Arnold was merely reciting Plaintiff's subjective allegations, this

is ultimately not clear on the record. When a record is unclear, an ALJ has a duty to "fully and fairly develop" it prior to making a final decision. <u>Nevland v. Apfel</u>, 204 F.3d 853, 857 (8th Cir. 2000).

As previously noted, the RFC the ALJ assigned Plaintiff indicated he was capable of medium work, which "involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds." 20 C.F.R. § 404.1567(c). Though the regulatory definition of medium work does not indicate how much sitting or standing is required, the lesser category of light work "requires a good deal of walking or standing . . . ." 20 C.F.R. § 404.1567(b). Thus, in this Court's opinion and assuming Dr. Arnold was assigning actual physical limitations, a person who can only stand for 20 minutes and walk up to 2 blocks is simply not capable of medium work as found by the ALJ, and the physical functional capacity the ALJ assigned Plaintiff was not supported by substantial evidence on the record as a whole.

**V.  CONCLUSION**

The ALJ erred in several respects, but the question of whether this Court should remand for further consideration or

solely for the purpose of awarding benefits remains. The Eighth Circuit has held that a remand for award of benefits is appropriate only where "the record 'overwhelmingly supports'" a finding of disability. <u>Buckner v. Apfel</u>, 213 F.3d 1006, 1011 (8th Cir. 2000) (citing <u>Thompson v. Sullivan</u>, 957 F.2d 611, 614 (8th Cir. 1992)).

Though this Court is persuaded the opinions of the state agency medical consultants who considered Plaintiff's mental capacity were inconsistent with the record as a whole, and the ALJ erred in assigning them great weight, this Court is not persuaded that a proper weighing of the evidence relating to Plaintiff's mental capacity would overwhelmingly support a finding of disability. Furthermore, though Dr. Arnold, the only examining source who considered Plaintiff's physical capacity on record, seemed to assign Plaintiff physical functional limitations which the ALJ failed to account for in the RFC he assigned Plaintiff, there is a legitimate question as to whether Dr. Arnold was merely reciting Plaintiff's subjective allegations, rather than making objective medical findings; as such, the record needs to be developed further.

Therefore, this case is remanded for further consideration in light of this Memorandum and Opinion Order.

**IT IS SO ORDERED** this 26th day of September, 2012.

Donald E. O'Brien, Senior Judge
United States District Court
Northern District of Iowa